UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

LARRY SHARP                                  CIVIL ACTION NO. 08-cv-0989

VERSUS                                       JUDGE HICKS

WARDEN, LOUISIANA STATE                      MAGISTRATE JUDGE HORNSBY
PENITENTIARY

## REPORT AND RECOMMENDATION

**Introduction**

Larry Stinson Sharp ("Petitioner") tracked down his former girlfriend Joni Sanders and shot Joni twice with a 12-gauge shotgun, killing her. Petitioner fled and made unsuccessful attempts to kill himself. He was arrested and charged with first degree murder, but the charge was reduced to second degree murder before trial.

Petitioner was convicted of second degree murder and given a mandatory life sentence. The conviction was upheld on appeal. State v. Sharp, 810 So.2d 1179 (La. App. 2d Cir. 2002), writ denied, 845 So.2d 1081 (La. 2003). Petitioner pursued post-conviction applications in the state court, and they were denied. He now seeks federal habeas corpus relief. For the reasons that follow, it is recommended that the petition be denied.

**Sufficiency of the Evidence**

Petitioner was convicted of second degree murder, which La.R.S. 14:30.1 defines as the killing of a human being "when the offender has a specific intent to kill or to inflict great bodily harm." Petitioner does not deny that he shot and killed Joni, but he argues that the

facts required a conviction of the lesser crime of manslaughter, which Louisiana defines as a homicide that would be first or second degree murder, but the offense is committed "in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection."  La. R.S. 14:31.

The evidence at trial included two statements given by Petitioner, the testimony of investigating officers, the testimony of the witnesses to the shooting, and testimony from friends and family about Petitioner's family history and his relationship with Joni.  The jury also heard from a psychologist, Dr. Mark Vigen, and a psychiatrist, Dr. George Seiden.

The evidence showed that Petitioner was married for 18 years, had a daughter, and maintained employment, but he drank heavily, used drugs, gambled, and had affairs, which led to the end of his marriage.  He later had a relationship with Joni, and the two lived together for a time, but they separated.  There was an incident during the relationship when Petitioner cut Joni with a box cutter, requiring stitches.

Petitioner and Joni had been apart for a time when, late on a Friday night, Joni called Petitioner and asked him to meet her at the Malibu Beach Club in Shreveport because she needed to see him.  Petitioner could tell from the caller identification that Joni was calling from his friend Marcio's phone. She said Marcio was passed out. After Petitioner said he could not meet her that night, Joni cursed Petitioner and apparently passed out herself.

Petitioner had known Joni was seeing someone else, but this was his confirmation that it was Marcio.  Marcio testified that Petitioner placed several calls to him that weekend, and

he left a message saying he was not mad but did want to talk to Marcio, who did not return any of the calls.

Petitioner got up on Saturday morning and went to Nacogdoches, Texas to visit Sarah Gresham.  The two did not have a romantic relationship, but they often comforted each other during hardships.  Ms. Gresham testified that Petitioner arrived "real upset" because a woman he cared a lot for had started seeing a friend of his, yet the woman seemed to still want Petitioner around.  Petitioner and Gresham drank beer through the day as they did chores around the house.  Petitioner went out that night to Jitterbug's and "had a few beers," then returned around midnight.  He lay down on the couch but could not sleep and asked if he could get in bed with Gresham and hold her, which she allowed.

Petitioner said during a recorded statement that he did not sleep a wink that night, thought about his situation all night long, and decided he was going to kill himself.  On Sunday morning, Petitioner told Ms. Gresham that he was going to McDonald's to get breakfast and would return soon.  Instead, Petitioner drove to Marshall, Texas to the home of a friend who he knew would be at work.  Petitioner used a key he had from once living in the house, let himself in, and took a 12-gauge semi-automatic shotgun.  He rearranged some caps and items on the gun rack so the friend might not miss the shotgun.

Petitioner next drove to a nearby deer lease camp.  Petitioner called a friend, Tim Cloninger, to meet him at the camp.  Petitioner said in a March 14 statement that he originally wanted Tim to come to the camp and find his body, but after he placed the call, he changed his mind and decided he would kill Joni, Marcio, and then himself.  Petitioner said

in a March 16 statement that he made the decision to kill the other two when he was on the way to the deer camp. While Petitioner waited on Tim to arrive at the camp, he wrote a note to his ex-wife and daughter, saying who he wanted as a pallbearer, and asking that his ashes be spread on the golf course.

Petitioner asked Tim if he could borrow his truck so he could move his furniture from Nacogdoches to move in with Sarah. Petitioner said he wanted to use Tim's truck because his had no grill or front license plate, which made it very noticeable, and the police in the East Texas areas he was about to visit knew he had a suspended driver's license and would have stopped him.  Petitioner took Tim home, returned to the camp, and retrieved the shotgun and some squirrel shot.  Petitioner said that he took six or seven Valium at about 2:00 or 2:30 p.m.

Petitioner knew that Marcio lived near Smithland, Texas, but he did not know the location of the home.  He drove to the area and began looking.  He put gas in the truck and filled a can with gasoline.  He drove to Joni's mother's house in nearby Jefferson, Texas, knocked to make sure no one was home, doused the home with gasoline and set it on fire. Petitioner drove back to Smithland and, over the next two hours or so, asked 10 or 12 people where Marcio lived. Petitioner said the two were supposed to go fishing.

Petitioner eventually found Marcio's mother's house, near Vivian, Louisiana, where he saw Marcio and his mother working in the yard.  Joni, who may have seen Petitioner drive past, began walking toward the house.  Petitioner said in his March 16 recorded statement that when he saw Joni walking toward the house he "decided right then that I was going to

kill her and Marcio and then myself."  Marcio testified that Petitioner stopped and asked Marcio why he had not returned his phone calls, and Marcio said he had been busy working around his mother's house and getting ready to leave town.  Petitioner asked if Joni was there and if Marcio minded if Petitioner talked to her for a minute.  Marcio said he had no problem with that, and Petitioner drove down the driveway to the house.

Petitioner said in his March 16 statement that when Marcio said he did not have time to return his calls, "I would have shot him right there but his mother was behind him." Instead, Petitioner drove toward the house and Joni, who ran into a screened porch at the back of the house.  Petitioner grabbed the shotgun and followed her inside. He said, "Joni, you're a lying whore," and he shot her twice.

Marcio and his mother testified that they heard the shots and came running toward the house.  Petitioner said in his statement that he raised the shotgun to shoot Marcio, but his mother was too close, so he did not shoot.  He got back in his truck, by which time the mother was standing aside and Marcio was running to his pickup; Petitioner knew that Marcio always carried a pistol. Petitioner fired once at Marcio as he was running.  The shotgun pellets hit Marcio's truck, but did not strike Marcio or his mother.  Marcio returned fire and emptied his pistol, putting a couple of rounds in Petitioner's truck as it drove away. The sheriff received a call about the shooting just before 6:00 p.m.

Petitioner "took a whole bottle of Valium" after the shooting, drove two or three miles away, and took a piece of hose that he stole at the same time he took the shotgun, used duct tape to connect it to the tailpipe of the truck, and put the end of the house in the truck

window.  Petitioner said he was just getting groggy when the truck overheated.  Petitioner used an ice chest of water in the back of the truck to cool the engine and allow a second suicide attempt, but the truck again quit running.  Petitioner took the shotgun and walked until he reached a pay phone.  He called his daughter, Holly, to tell her goodbye.

Holly testified that her father called her the night before the shooting and was very upset, crying, and saying that he was going crazy.  He was desperate to speak to Holly's mother, but she had changed her phone number.  The next time Holly heard from her father was Sunday afternoon, when he called and said he had done something bad and needed to talk to her mother.  The caller ID indicated the call came from a pay phone.  Petitioner was crying and very upset.  Holly had her mother attempt to call Petitioner, but the pay phone would not accept calls.  They never heard back from Petitioner.

Petitioner told police that, after making the call, he tried to shoot himself in the head with the shotgun, but he could not reach the trigger with the gun in position.  He found a forked stick and attempted to use it to pull the trigger, but he managed only to shoot himself in the chest.  Someone at Mud Puppies, a nearby bar, heard the shot and called 911.  Petitioner told the emergency responders to let him die.

Petitioner left a letter to his family at the deer camp.  Police found in his pockets notes that Petitioner said he wrote while he was in the truck trying to commit suicide.  One read, "I would have killed you Marcio but your mom was in the way you sorry bastard."  Another asked the reader to look in his apartment to see how many times "she" had called Petitioner and said that she came over about two weeks earlier and had sex with Petitioner several

times.  The note ended, "so I'm not the only bad one here."  Another note said: "Marcio, I hope you dream about it every night.  By the way police he sells 2 lbs of weed + (?)."  A final one said, "tell Roge (a Texas police officer who knew Petitioner's ex-wife and had arrested Petitioner) if I could have got to town he was next."

Dr. Mark Vigen, a forensic psychologist, testified for the defense that Petitioner suffered from narcissistic personality disorder and chemical dependency on drugs and alcohol.  The personality disorder, Dr. Vigen testified, would have made Petitioner very hurt, surprised, and enraged when Joni rejected him for Marcio.  He opined that Petitioner could distinguish between right and wrong in the sense that he was making judgments, such as not shooting at Marcio because he did not want to hit his mother, but his judgment and impulse control was impaired by a stimulus overload.  Dr. Vigen said Petitioner was in a state analogous to a person who is driving a car down the street when suddenly bees and wasps enter the car and attack.  The driver may have an accident, or he may manage to control the car and get rid of the bees.  He can still drive and plan, but his planning, judgment, and impulsiveness will be very poor.

Dr. George Seiden, an expert in psychiatry and forensic psychiatry, testified for the prosecution.  He diagnosed Petitioner with alcohol dependence and adjustment disorder with depressed mood.  He agreed that Petitioner suffered from narcissistic personality disorder, but he did not believe the anger caused by the disorder diminished Petitioner's capacity to control his behavior.  Dr. Seiden pointed out that Petitioner was angry but not in a senseless rage, evidenced by his avoiding harm to Marcio's mother and focusing on the people at

which he was angry.  Seiden believed that Petitioner's actions were calculated and reasoned, and Petitioner was capable of deciding not to shoot Joni.

In evaluating the sufficiency of evidence to support a conviction "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 99 S.Ct. 2781, 2789 (1979).  The trier of fact has broad discretion to "resolve conflicts in testimony, to weigh evidence, and to draw reasonable inferences from basic facts to ultimate facts." Id. The Jackson inquiry "does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." Herrera v. Collins, 113 S.Ct. 853, 861 (1993).

Habeas corpus relief is available with respect to a claim that was adjudicated on the merits in the state court only if the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  28 U.S.C. § 2254(d).

A state court's decision is contrary to clearly established Supreme Court precedent when it relies on legal rules that directly conflict with prior holdings of the Supreme Court or if it reaches a different conclusion than the Supreme Court on materially indistinguishable facts. Pape v. Thaler, 645 F.3rd 281, 287 (5th Cir. 2011). A state court makes an

unreasonable application of clearly established federal law when it identifies the correct governing legal principle from the Supreme Court's decisions but applies it to the facts in a way that is not only incorrect but objectively unreasonable. Renico v. Lett, 130 S.Ct. 1855, 1862 (2010).

The state appellate court reviewed the testimony and other evidence in great detail. It identified the elements of the crimes of second degree murder and manslaughter and applied the Supreme Court's Jackson standard. The court concluded that the jury "obviously accepted the expert testimony of Dr. Seiden and rejected Dr. Vigen's view," as a trier of fact is free to do when assessing the testimony of witnesses. Considering Dr. Seiden's testimony that Petitioner's mental and emotional problems did not diminish his capacity to control his behavior, the jury made a reasonable conclusion. The court also pointed to the evidence of Petitioner engaging in a long search for his victims, trading vehicles to avoid detection, and his calm conversation with Marcio immediately before he killed Joni. These were all facts that could allow a reasonable jury to find that Petitioner had specific intent to kill Joni and did not act in sudden passion or heat of blood caused by provocation sufficient to deprive an average person of his self control. State v. Sharp, 810 So.2d at 1184-87.

The above discussion leads to the inevitable conclusion that the state court's decision was neither contrary to nor an unreasonable application of Jackson to the facts in this case. Petitioner makes arguments as to how the evidence might or should be construed to favor a manslaughter verdict, but they are the kinds of arguments one should address to the jury, and this case is past that point. The jury made its decision, the state appellate court reviewed it

under the correct principles of law, and the court reached a very reasonable decision that the second degree murder verdict was supported by the evidence.  Accordingly, habeas relief is not permitted on this claim.

**Non-Unanimous Jury**

When punishment is necessarily confinement at hard labor, such as in a second degree murder prosecution, Louisiana law provides that the case shall be tried by a jury of twelve, ten of whom must concur to render a verdict.  La. C. Cr. P. art. 782.  Petitioner was convicted by an eleven to one vote of his jury. He argued on direct appeal that the non-unanimous verdict provision was unconstitutional.  He especially complained that his original charge of first degree murder required a unanimous verdict, thus the reduction of the charge to second degree murder actually prejudiced him. The state appellate court rejected the claim, noting that Johnson v. Louisiana, 92 S.Ct. 1620 (1972) and Apodaca v. Oregon, 92 S.Ct. 1628 (1972) upheld the validity of non-unanimous jury verdicts for 12-person juries in Louisiana and Oregon (the only two states that permit them).  State v. Sharp, 810 S.2d at 1193-94.

Petitioner can obtain habeas relief on this claim only if that state court adjudication was contrary to or involved an objectively unreasonable application of "clearly established federal law, as determined by the Supreme Court of the United States."  Section 2254(d); Renico, 130 S.Ct. at 1862.  The justices were unusually divided in their approaches in Johnson and Apodaca.  See McDonald v. City of Chicago, 130 S.Ct. 3020, 3035 n.14 (2010) (describing the various opinions).  Some legal scholars and others take the position that subsequent Supreme Court decisions that discuss how the Bill of Rights apply to the states

have undermined Johnson and Apodaca, but the Supreme Court has thus far denied certiorari in cases that sought to overturn those precedents. See e.g., Barbour v. Louisiana, 131 S.Ct. 1477 (2011) and Herrera v. Oregon, 131 S.Ct. 904 (2011).  Petitioner makes the additional argument that because Burch v. Louisiana, 99 S.Ct. 1623 (1979) held it unconstitutional for Louisiana to convict for a nonpetty offense on the votes of five members of a six-person jury (83.3%), it should also be unconstitutional to allow a murder conviction based on the votes of ten of twelve jurors (also 83.3%).

When Supreme Court precedents exhibit a lack of clarity about the applicable principle, obtaining habeas relief is quite difficult.  See Lockyer v. Andrade, 123 S.Ct. 1166 (2003).  The Supreme Court decisions we have available on non-unanimous juries support the state court's decision in this case. The decisions may be less than clear in rationale and subject to reasonable debate, but that is a long way from making the state court's adjudication contrary to or an objectively unreasonable application of clearly established Supreme Court precedent.  Habeas relief should be denied, as it was when similar arguments were presented in cases such as Gillespie v. Wilkinson, 2010 WL 5373931, *9 (E.D. La. 2010) and Divers v. Warden, 2010 WL 4291330, *13 (W.D. La. 2010).

**The Recorded Statement**

Sheriff's office investigator John May and DA investigator Ricky McDonald went to Petitioner's hospital room on March 14 and, after obtaining Miranda waivers, conducted an unrecorded interview.  May testified at a suppression hearing that he liked to "break the ice" with a person and not use up a lot of tape talking about the weather and such. Once the facts

were "out in the open," he would then record the confession.  After having a full discussion with Petitioner on the 14th, of which May took notes, May asked Petitioner to go over the statement again on tape, but Petitioner said he was tired and asked the men to come back the next day.

The investigators returned on March 16 and told Petitioner why they were there. Petitioner, according to May, "said that he wanted to give us a statement but that his lawyer wanted to meet with him first."  Tr. 676.  McDonald recalled that Petitioner "said that an attorney had tried to contact him up there."  He added, "I don't know exactly how he worded it, but that the attorney wanted to talk to him."  Tr. 656.

May asked Petitioner the name and phone number of his lawyer, who was Brad Morin in Marshall, Texas.  May called Morin's office, but Morin was out of town.  May spoke to associate Jennifer Jeffries. Attorney Jeffries testified that she had been directed by Morin to visit Petitioner at the hospital on March 15 to execute documents that would allow Petitioner's ex-wife and daughter to take care of his apartment and affairs.  Jeffries said she told Petitioner that Morin would be by to see him but was then out of town.  Jeffries said she was generally aware that Petitioner had been charged with some crime in connection with a homicide.  Tr. 704-06.

Jeffries testified that she received a call from investigator May, which she described as follows:

> He was wanting to determine whether or not we represented Mr. Sharp - -
> well, actually initially what he explained to me is that Mr. Sharp had requested

to speak with Mr. Morin, and I'm assuming that's how Detective May got the number to our office.

Tr. 707.

Jeffries then said she could not recall the specific words used by May, but she remembered that May said he was calling to speak to Mr. Morin because Petitioner had either indicated that Morin was his attorney or that he wanted to speak to Morin. Jeffries said she told May that if Petitioner had asked to speak to an attorney, "you know the ramifications of that as well as I do, but you go ahead and proceed however you see fit." Jeffries also told May that she did not know whether the firm was representing Petitioner in the criminal matter, and she suggested she call Mr. Morin and call May back. Jeffries said she got in touch with Morin and returned a call to May within 10 minutes, but there was no answer. Tr. 705-12.

May testified that, after he got off the phone with Jeffries, he understood that the Texas firm was representing Petitioner in Texas on a civil matter, "and that if I wanted to talk to him and he was willing that it was okay." May denied that Petitioner ever asked to speak to an attorney or said he wanted to talk to an attorney before he gave his statement. Tr. 677. May relayed his conversation with Jeffries to Petitioner, who said he would speak on tape. Tr. 677-78. Petitioner then gave the March 16 recorded statement that was played at trial.

A written report by May states that, after he took the statement, he received a page from attorney Jeffries' office. He returned the call and spoke to someone who told him that Jeffries was on her way to the hospital and did not want May talking to Petitioner about the

arson in Texas without her being present. May stated that the interview was already completed. Tr. 49.

If a suspect waives his right to counsel after receiving <u>Miranda</u> warnings, officers are free to question him, but if the suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation.  <u>Edwards v. Arizona</u>, 101 S.Ct. 1880 (1981).  The rule of <u>Edwards</u> requires courts to determine whether the accused actually invoked his right to counsel, which is an objective inquiry that requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney. <u>Davis v. U.S.</u>, 114 S.Ct. 2350, 2355 (1994).  "But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning."  <u>Id</u>.  "Rather, the suspect must unambiguously request counsel."  <u>Id</u>. The Court held that,"Maybe I should talk to a lawyer" was not a clear invocation.  <u>See</u> <u>also</u> <u>Soffar v. Cockrell</u>, 300 F.3d 588, 595 (5th Cir. 2002) (en banc) (collecting examples of statements that were inadequate).

The prosecutor cited <u>Davis</u> and related Louisiana decisions at a hearing on a motion to suppress.  Judge Emanuel did not discuss <u>Davis</u> in his opinion that suppressed the March 16 statement based on a finding that there "seems to have been no doubt that Defendant wanted Attorney Morin present before making the recorded statement."  He also found that Petitioner's request "to have his attorney present was clear and unambiguous."  Tr. 204-12.

The State applied for a supervisory writ before trial, and the appellate court issued a short order that the "district court erred in ordering suppression of defendant's recorded statement of March 16, 2000."  The court cited <u>Davis</u> and similar Louisiana cases.  Tr. 213.  Petitioner raised the issue again on direct appeal, and the appellate court found no basis to change its prior decision.  <u>State v. Sharp</u>, 810 So.2d at 1188-89.  Chief Judge Norris concurred, saying that on the conflicting evidence he would defer to the trial court's finding that Petitioner did not waive his right to counsel.  He found, however, that the admission of the confession was harmless error because of other overwhelming evidence of guilt.

Petitioner's habeas petition renews the arguments he made before the state courts. They do not warrant relief because there was no compelling evidence that Petitioner made a clear and unambiguous invocation of his right to counsel.  <u>Davis</u> makes clear that the court does not have to find evidence of an affirmative waiver, but a direct invocation of the right to counsel. There was perhaps evidence that reasonable jurists could have based a finding of an invocation on, but the last reasoned state court decision did not include such a finding.

The state appellate court held that the statement was admissible under <u>Davis</u>, without explanation. The federal habeas court is bound by the state court's factual findings, both implicit and explicit. A determination of a factual issue made by a State court shall be presumed to be correct, 28 U.S.C. § 2254(e)(1), and the  presumption applies to both explicit findings of fact and "those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." <u>Young v. Dretke</u>, 356 F.3d 616, 629 (5th Cir. 2004).

The state court made an implied, unarticulated finding that Petitioner did not unambiguously invoke his right to counsel as required by <u>Davis</u>.  Petitioner has not pointed to evidence that would overcome the presumption. Furthermore, the state court's decision, based on the record of this case, was not so incorrect as to be an objectively unreasonable application of the principle established in <u>Davis</u>.

**Right to Testify**

The Supreme Court held in <u>Rock v. Arkansas</u>, 107 S.Ct. 2704 (1987) that every criminal defendant has the right to testify on his own behalf.  Petitioner, in a post-conviction application, argued for the first time that his counsel prevented him from testifying.

The State responded with an affidavit from defense counsel Alan Golden.  Golden testified that he did not have a specific recollection of discussing with Petitioner whether he should testify, but he has a practice that he followed with every client without exception. Golden said he informs every client of his options with respect to testifying, and he advises the client whether he thinks testifying is a good idea.  He makes a recommendation, but he leaves the ultimate decision to the client, and he tells the client that the decision is his and his alone.  Golden testified that he was "certain" that Petitioner never said he wanted to testify against Golden's advice not to do so.  Had Petitioner made such an indication, Golden testifies, he would have asked for a recess to explore that option further with Petitioner, and

he would have accommodated Petitioner had Petitioner made it clear that he wished to testify.  Tr. 1642-C.

The trial court denied relief.  The appellate court found no indication from materials provided by Petitioner that he would meet the standard concerning deprivation of the right to testify set out in State v. James, 938 So.2d 691 (La. 2006), which held that mere conclusory allegations are insufficient to rebut a presumption arising from a defendant's silence at trial that he waived his right to testify.  The appellate court found "no record evidence" that Petitioner desired to testify but was prevented by counsel, and it noted the affidavit of counsel that was completely to the contrary.  Tr. 2548.

Petitioner points to a statement in U.S. v. Mullins, 315 F.3d 449, 455 (5th Cir. 2002) that defendants generally must speak only through counsel so, absent something in the record suggesting a knowing waiver, silence alone cannot support an inference of such a waiver. The issue could be avoided altogether if, as suggested in Mullins, defense counsel routinely advised the trial judge out of the jury's presence that the defendant will or will not testify, and  careful trial judges will make a similar inquiry even without initiation by counsel. Courts and commentators have debated the pros and cons of various procedures designed to protect the right to testify.  See Christopher Pape, Ineffective Assistance of Rule 1.2: Seeking an On-the-Record Waiver to Protect Defendant's Right to Testify, 35 J. Legal Prof. 437 (2011);  Criminal Law-Right to Testify- 7th Circuit Holds that Defendant's Waiver of the Right to Testify was Valid Despite District Court's Failure to Engage in an On-the-Record Colloquy Regarding the Decision, 121 Harv. L. Rev. 1660 (2008); and Timothy O'Neill,

Vindicating the Defendant's Constitutional Right to Testify at a Criminal Trial: The Need for an On-the-Record Waiver, 51 U. Pitt. L. Rev. 809, 838 (1990) (proposing a waiver colloquy between counsel and client to reduce judicial involvement).

Even without the benefit of any presumption created by Petitioner's silence at trial, the State has all of the evidence in its favor.  It presents counsel's affidavit, and Petitioner has presented no competing evidence. The state courts have found counsel's affidavit persuasive.  Petitioner has not shown that the state court's adjudication of this claim was an objectively unreasonable application of Supreme Court precedent or was based on an unreasonable determination of the facts in light of the evidence presented in state court, so Section 2254(d) prevents habeas relief.

**Notes**

Petitioner complains that the trial judge violated Louisiana procedural law when he allowed the deliberating jury to read the notes Petitioner wrote during his suicide attempt. He also argues that counsel was ineffective for allowing this to happen. The arguments are rooted in La. C. Cr. P. art 793, which provides that jurors must rely on their memories and shall not be allowed, when they retire from the courtroom, "access to any written evidence or to any notes of the testimony of any witness, but they may take with them when they retire to deliberations, any object or document received in evidence that requires a physical examination to enable them to arrive at a just conclusion."  Louisiana courts interpret this article to mean that a jury is not to inspect written evidence except for the purpose of a physical examination of a document itself to determine an issue which does not require the

examination of the verbal contents of the document.  For example, a deliberating jury can examine a written statement to compare a signature, but it cannot examine the contents of that writing. <u>State v. Perkins</u>, 423 So.2d 1103, 1109-10 (La. 1982) (error for jury to read defendant's statement after retiring to deliberate); <u>State v. Zeigler</u>, 920 So.2d 949, 955-56 (La. App. 2d Cir. 2006).

Deputy McLamb, who searched Petitioner upon arrest, identified Exhibits 9-13 as notes he took from Petitioner's pockets.  McLamb said Petitioner told him he had some notes in his pocket, and McLamb assumed they were suicide notes.  The prosecutor had the items marked for identification.  Tr. 802-03.  They were apparently admitted as exhibits at some point, as the transcript lists them as State exhibits.  Tr. 759-60.  At the close of the State's case, the prosecutor specifically asked that Exhibits 14-18 be admitted into evidence, and that "our evidence" be published to the jury, with the exception of the cassette recording of the March 16 statement.  A recess was taken immediately afterward. There is no affirmative indication on the record that any exhibits were shown to the jurors at that time.  Tr. 820-21.

After all evidence was heard, the judge asked for a stipulation as to what exhibits could be published to the jury without counsel returning to court to discuss the issue.  During the discussion, the judge mentioned Exhibits 9-13 as notes from the defendant and said, "They can go, even though they are writings."  Defense counsel said, later in the discussion, that Article 793 "allows any object or document so long as it's not testimony." (The court and counsel appear to have been operating under a mistaken interpretation of Article 793, which is not surprising given its somewhat ambiguous language.) The court then obtained

Page 19 of  31

a stipulation of counsel that the court could publish those exhibits to the jury, as long as it was done under the supervision of the bailiff and clerk.  There is no record statement that any items of evidence were then actually given to the jury.  Tr. 1004-05.

Petitioner first raised these issues in a post-conviction application.  Attorney Golden filed an affidavit that he made a determination, as part of trial strategy, that the notes would be helpful to the defense. The notes, especially a suicide note, showed that a claim of heat of passion and mental disturbance was not a recent fabrication.  Golden said he believed allowing the jury to read the notes would let his client reiterate his story to the jury and that they clearly demonstrated his distraught emotional state at the time of the shooting.  Tr. 1642-B.

The state appellate court called for additional evidence on the issue, and an evidentiary hearing was held.  Tr. 2636-70.  A deputy clerk testified that her records indicated that the jurors would have been allowed to see the items if requested, but she had no recollection or evidence as to whether the jurors actually asked to see the exhibits. Petitioner argued that he recalled the jury asking for the notes to be presented to them and to have the instructions reread on the crimes charged.  The prosecutor pointed to a transcript that showed the jury foreman did ask for the entire charge to be read again.  It was read, and the jury foreman afterwards said the jury had no other request at that time.  See Supplement to Jury Charge at Tr. 2683-94.

Petitioner argued that attorney Golden's affidavit suggests the jury actually saw the notes during deliberations. Judge Emanuel found Golden's affidavit, in light of the testimony

from the minute clerk, did not indicate the jury in fact was given the notes but only that counsel would allow the jury to see the notes.  The judge said he had reviewed the various transcripts and found no evidence, except Petitioner's unsupported claim, that the jurors were actually given the challenged notes during deliberations.  The court found that Petitioner was mistaken and had not met his burden of proof.  The court went on to find that defense counsel had not adequately waived the mandate of Article 793 and had done so hastily, but any error was harmless given the overall record.  Tr. 2695-2707.  The state appellate court issued the last reasoned decision on the issue.  It wrote:

> Assuming *arguendo* that the publication occurred, we decline to grant relief on this strategic decision made at trial.  No substantial rights were violated, and any error committed was harmless.

Tr. 2709.

Petitioner's first argument is that the trial court's violation of Article 793 deprived him of due process.  Petitioner does not, however, point to any clearly established Supreme Court precedent that bars jurors in criminal trials from viewing written evidence, as Section 2254(d) requires for relief on such a claim.  And "numerous courts" support the view that it is not necessarily improper for a trial judge to permit documents or tape recordings, even those containing confessions of guilt, into the jury room in a criminal case when there is no statutory provision on the issue.  37 A.L.R. 3d 238, § 2[a].  Each state makes a policy choice on which exhibits the jury may take into deliberations. The trial court's possible violation of the choice Louisiana made in Article 793 is of no moment because "federal habeas corpus relief does not lie for errors of state law."  Estelle v. McGuire, 112 S.Ct. 475 (1991).

Page 21 of  31

Petitioner argues that his counsel was ineffective for allowing publication of the notes. To prevail on a claim of ineffective assistance of counsel, a petitioner must establish both that his counsel's performance fell below an objective standard of reasonableness and that, had counsel performed reasonably, there is a reasonable probability that the result in his case would have been different. Strickland v. Washington, 104 S.Ct. 2052, 2064 (1984).

Petitioner's claim was adjudicated and denied on the merits by the state court, so the question here is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether the determination was objectively unreasonable, which is a substantially higher threshold. Schriro v. Landrigan, 127 S.Ct. 1933, 1939 (2007). And, because the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied it. The federal court's review of a Strickland claim is thus "doubly deferential." Knowles v. Mirzayance, 129 S.Ct. 1411, 1420 (2009).

Counsel's misunderstanding of Article 793 or knowing waiver, whichever was the case, resulted in no prejudice for two reasons.  First, the trial judge found as fact that the jury did not actually see the notes. In reviewing a state court's denial of habeas relief, the state court's factual determinations are "presumed to be correct," and the petitioner must rebut this presumption with "clear and convincing evidence." Pape, 645 F.3rd at 287, citing 28 U.S.C. § 2254(e).  Petitioner's arguments on this point are built on strained constructions of language and unsupported assertions. That is not enough to overcome his heavy burden.

Second, when the record as a whole is considered, there is not a reasonable probability that the verdict in the case would have been different depending on whether the jury did or did not see the notes during deliberations. Petitioner argues the notes are prejudicial to him because they contain his threats to other persons, but the notes were also of potential benefit to the manslaughter defense because they demonstrated the degree of Petitioner's rage or "heat of blood" in the time just after the killing.  Also, Petitioner talked at some length during the March 16 statement, which the jury heard, about his dislike of the Marshall policeman and how he wrote a note saying that he would kill him if he could get to town. Tr. 132 -36. There is no basis to find that the state court's adjudication of this claim was an objectively unreasonable application of Strickland, especially given the doubly deferential standard that applies.

**Ineffective Assistance of Counsel**

### A.  Not Applying for Writs

Petitioner asserts ineffective assistance of counsel on three other grounds. He first complains that trial counsel should have filed an application for supervisory writs with the Supreme Court of Louisiana after the appellate court issued its pretrial writ ruling that the March 16 recorded statement was admissible.  Claims of ineffective assistance in pursuing appellate remedies are judged under the Strickland standard.  Ries v. Quarterman, 522 F.3d 517, 531 (5th Cir. 2008).  Counsel need not raise every non-frivolous ground, "but should instead present solid, meritorious arguments based on directly controlling precedent."  Id., quoting Schaetzel v. Cockrell, 343 F.3d 440, 445 (5th Cir. 2003).  When a petitioner claims

that counsel omitted an issue that should have been argued, the petitioner must show that had the issue been raised there was a reasonable probability that he would have won on appeal. Smith v. Robbins, 120 S.Ct. 746, 764 (2000); Moreno v. Dretke, 450 F.3d 158, 168 (5th Cir. 2006).

Petitioner first raised this claim in a pro se brief filed on direct appeal.  The appellate court found that the other evidence was sufficient to support the verdict even if the Supreme Court had reversed the pretrial ruling and found the March 16 statement admissible.  That evidence included two other inculpatory statements by Petitioner, expert witnesses, and eyewitnesses at the scene.  State v. Sharp, 810 So.2d at 1195. The March 14 statement was just as inculpatory, although perhaps a bit less devastating because it was not tape-recorded.

After the appellate court affirmed on direct appeal, Petitioner filed a pro se application for writ of certiorari to the Supreme Court of Louisiana, and he specifically briefed the underlying issue of whether the March 16 statement was taken after an invocation of the right to counsel.  Tr. 1118, 1147-49.  The Supreme Court denied writs without comment.  Tr. 1260. Petitioner applied for rehearing, making additional argument regarding the suppression issue, and the Court denied the request.  Tr. 1264-69B.

There is no need to speculate as to whether the Supreme Court would have suppressed the statement if counsel would have pressed the issue by writ application before trial.  The issue was presented twice to the Supreme Court during the appellate process, and no relief was granted.  Accordingly, Petitioner cannot show that had counsel raised the issue during

the pretrial appellate process there was a reasonable probability that he would have prevailed and had the statement suppressed.  Habeas relief is not available on this claim.

### B.  Intoxication Defense

Voluntary intoxication may be a defense to a specific intent crime such as second degree murder where the circumstances indicate that an intoxicated or drugged condition has precluded the presence of specific intent.  La. R.S. 14:15.  Petitioner argued on direct appeal that his counsel was ineffective for not presenting an intoxication defense.  The appellate court found the record insufficient to review the claim on direct appeal. Petitioner then presented it in a post-conviction application. He makes a related argument that counsel was ineffective because he did not call at trial Dr. Paul Ware (a consulting psychiatric expert) or Dr. Herrin (a treating physician) to testify regarding intoxication.  The State responded to the application with an affidavit from defense counsel, in which he testified:

> I believed that intoxication was not a viable defense, based on the facts of the case, the law and my experience as a criminal defense attorney.  Although there was ample evidence that Mr. Sharp had been drinking heavily, in my judgment there was simply too much evidence that his actions were nevertheless intentional.

> Moreover, I felt that a defense of intoxication mixed in with the psychiatric testimony would be unnecessarily confusing to the jury.  I felt that would have blunted the effect of the psychiatric evidence, and I made a tactical decision to pursue the defense which had the best evidence to support it.

> Paradoxically, our defense was not that alcohol precluded the formation of specific intent, but rather, that it contributed to it.  My strategy was that the jury be made aware of Mr. Sharp's alcohol consumption as a factor that exacerbated his anger, and contributed to his unstable mental condition in support of the manslaughter evidence.

Tr. 1642-B.  The trial court also held an evidentiary hearing at which defense counsel testified.

Attorney Golden testified at the hearing that he considered the defense and discussed the issue of chemical dependency with Dr. Vigen during his trial preparation.  They particularly discussed the issue of Petitioner taking Valium, Xanax, and alcohol in combination.  In the end, Golden elected to focus on the manslaughter theory rather than risk presenting possibly inconsistent defenses if he also argued for intoxication.  He said he believed there was overwhelming evidence that Petitioner had specific intent during his premeditation and planning of the incident in the hours that preceded it despite his consumption of intoxicants during that time.  Petitioner went through elaborate steps, such as procuring a truck and shotgun, writing suicide notes, and searching out Marcio's location, all of which indicated he was not so intoxicated as to preclude forming specific intent.  Counsel said he thought that it was a better plan to pursue the manslaughter defense alone, and argue that Petitioner knew what he was doing up until the point of provocation when he lost self-control.  Counsel said he did not specifically recall why he did not call Dr. Ware, but he believed the defense did presented a complete history of drug and alcohol abuse during the testimony of Dr. Vigen as well as Dr. Seiden.  Golden said his best guess was that he decided not to call Ware and Herrin because they would have been cumulative of Dr. Vigen's testimony.  Tr. 2146-76.

Dr. Ware's written report recounted how Petitioner began drinking at age 13 and drank two or three beers almost every weeknight during high school and a six-pack to 12-

pack on weekends.  His drinking increased after high school.  He drank at least six beers a day and 12 to 24 on the weekend.  He started adding a half-pint to pint of liquor a day to his drinking.  He drank daily from age 30 to 42, including drinking at work, but he was still able to function.  He was arrested for DWI six or seven times.  He also began using marijuana at age 18 and smoked five to six joints a day until his arrest.  Petitioner had a gambling addiction and estimated that he spent about $30,000 a year for the last five or six years on football, horse races, and golf.  Dr. Ware diagnosed dysthymia versus major depressive disorder, polysubstance abuse and dependence, and narcissistic personality traits.  Tr. 2207-2211.  Petitioner represents that Dr. Herrin would have testified that he had prescribed medications to treat Petitioner for depression in the year before the shooting.

Judge Emanuel found that the testimony of attorney Golden was "more significant and detailed" than that offered by Petitioner on these issues, but said "the testimony had its shortcomings because of the variations of recollections."  He found as fact that Petitioner and counsel had communicated regarding the intoxication defense and that counsel asserted the defense was not plausible.  He also found that Petitioner did not show a reasonable probability that the outcome of his trial would have been different had counsel put forth a defense of intoxication in addition to the manslaughter defense.  Tr. 2034-36.

The appellate court wrote that the trial court had correctly determined that counsel was not ineffective because "trial counsel discussed the case with the applicant, made logical assessments of the defenses available, selected a defense that allowed all the issues (his mental status, drug and alcohol use, the provocation and his alleged loss of self-control) to

be placed before the jury, and introduced evidence in support of those issues." The appellate court found no reasonable probability that the outcome would have been different had additional evidence of intoxication been introduced or the defense of voluntary intoxication been submitted to the jury.  Tr. 2081.

Petitioner picks lines from Dr. Ware's report, such as remarks that Petitioner seemed remorseful, cooperative, sincere, and believable during his examination.  Those comments would have been of marginal relevance or impact at trial.  Relevant to the proposed intoxication defense, Dr. Ware described Petitioner's history of addiction but made no statement that Petitioner was so intoxicated at the time of the crime that he could not form specific intent.  His diagnosis was similar to that offered by Dr. Vigen, which supports counsel's assumption that he elected not to call Ware because his testimony would have been largely cumulative.

Petitioner states that Dr. Herrin prescribed medication to treat him for depression, and he speculates that Herrin could have aided an intoxication defense.  "[C]omplaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what the witness would have testified are largely speculative." Evans v. Cockrell, 285 F.3d 370, 377 (5th Cir. 2000). Evans reversed a district court that granted habeas relief after assuming that witnesses, from whom no affidavits were presented, would have testified favorably for the defense. See also Bruce v. Cockrell, 74 Fed.Appx. 326 (5th Cir. 2003)(rejecting Strickland claim for lack of affidavits by the uncalled witnesses).

Judicial scrutiny of counsel's performance must be highly deferential, make every effort to eliminate the distorting effects of hindsight, and evaluate the conduct from counsel's perspective at the time.  The court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, meaning the defendant must overcome the presumption that the challenged action might be considered sound trial strategy.  There are many ways to provide effective assistance in a given case, and even the best defense attorneys would not defend every client in the same way.  Strickland, 104 S.Ct. at 2065.

Counsel is "entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies."  Harrington v. Richter, 131 S.Ct. 770, 789 (2011).  There is no expectation that competent counsel will be a "flawless strategist or tactician," and representation is constitutionally ineffective only if it so undermines the proper functioning of the adversarial process that the defendant was denied a fair trial.  Id. at 791.  "[A]n attorney's strategic choices, usually based on information supplied by the defendant and gathered from a thorough investigation of the relevant law and facts, 'are virtually unchallengeable.'"  Pape, 645 F.3rd at 289, quoting Strickland.

Counsel consulted with experts and elected a defense strategy for which he could articulate a rational basis. He reasonably determined that the intoxication defense might be confusing or inconsistent with his manslaughter theory, and it risked a loss of credibility with the jury by arguing for such a degree of intoxication in the face of overwhelming evidence that Petitioner performed at a high level in the hours preceding the crime.  Petitioner argues

that his deliberate and planned actions before the shooting could be squared with an intoxication defense by arguing that his intoxication did not reach the requisite level to preclude intent until just at the moment of the murder, but there is no factual basis for that contention. It is mere speculation.

The state court reviewed the record and reached a reasoned determination that neither the performance nor prejudice prong of Strickland was met.  The decision appears to be correct to the undersigned, and there is no room to argue that it was so incorrect as to be an objectively unreasonable application of the Strickland principles.  Counsel elected a trial strategy based on his investigation and preparation.  He did not succeed in overcoming the State's strong case, but that does not make the strategy so unreasonable that the conviction must be vacated.

Accordingly,

**IT IS RECOMMENDED** that the petition for writ of habeas corpus be **denied**.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b).  A party may respond to another party's objections within seven (7) days after being served with a copy thereof.  Counsel are

directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 6th day of September, 2011.

_____
MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE